**Marion Thomas WEST, Individually and d/b/a Royle Container Company, Appellant,**

v.

**BRENNTAG SOUTHWEST, INC., Successor in Interest to Delta Solvents and Chemical Company, formerly d/b/a Delta Container, Appellee.**

No. 06–04–00080–CV.

Court of Appeals of Texas, Texarkana.

Submitted June 16, 2005.

Decided July 20, 2005.

John R. Mercy, Mercy, Carter & Tidwell, LLP, Texarkana, Ron Adkison, Wellborn Houston, LLP, Henderson, for appellant.

Craig A. Morgan, Elizabeth G. Bloch, Brown McCarroll, LLP, Austin, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice CARTER.

This is an appeal from a judgment in favor of a current landowner, Marion Thomas West, Individually and d/b/a Royle Container Company (West), awarding him $1,024,986.30 in damages and $500,000.00 in exemplary damages against a former operator on the land, Brenntag Southwest, Inc., Successor in Interest to Delta Solvents and Chemical Company, formerly d/b/a Delta Container (Delta/Brenntag), who engaged in drum reconditioning and waste disposal that caused significant contamination of the property. West appeals the trial court's failure to award attorney's fees. Brenntag brings several points of error, raising issues of standing, nature of the injury to the land, breach of contract, and measure of damages. We sustain two of Brenntag's cross-points of error, concluding that West lacked standing to bring a cause of action in negligence or nuisance for injury to his land and that the jury's findings regarding breach of an agreed order lacks support in the record. Based on those conclusions, we will overrule West's point of error concerning attorney's fees. Accordingly, we will reverse the trial court's judgment and render judgment that West take nothing by his suit.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Delta's Business

Delta Solvents & Chemical Company, predecessor-in-interest to Brenntag, leased the land at 200 Valentine Avenue in Longview from the Walker Trusts. Delta entered into a contract to dispose of solvents and paint and also carried on a drum recycling business at the property.[1] The record demonstrates that these operations involved the dumping of paint and solvents into earthen pits and into a buried milk truck. The record shows that Delta washed out the fifty-five gallon drums onto the ground and buried other fifty-five gallon drums containing hazardous waste. Not surprisingly, the record shows that, in 1980, Delta suspected the soil was polluted and ceased its business.

### B. Sale of Business to Sikes

In 1980, Delta sold its business to Philip Sikes. Sikes leased the property from the Walker Trusts until 1982, when he undertook to purchase the land. Before the purchase, Sikes required removal of two buried tanks, one being the buried milk truck tank. He also had Delta remove some of the contaminated soil which, Sikes testified, Delta simply moved to another one of its properties down the road. While he owned the property, Sikes "heard" that drums had been buried on the property, but never located any. Sikes also operated a drum reconditioning business, but recycled the wastewater generated from the cleaning of the drums.

### C. West Purchases Property from Sikes

In 1984, West purchased the property from Sikes. West continued the drum reconditioning until 1988. In 1988, West began preparations to build a loading dock on the property, preparations which in-

---

1. David Vickery, a former Delta employee, described the business as a "shotgun opera-tion" in which the "homemade" devices never functioned properly.

cluded bulldozing down a tree. The bulldozer struck a buried drum that began spewing liquid, which then ignited. West discovered that this area has been used as a drum disposal. West contacted Sikes and Delta. The following day, a former Delta employee told West that he thought Delta had buried the drums there. West notified the Texas Water Commission (TWC),[2] and it immediately began to investigate the site. Twenty drums were ultimately unearthed.

## D. TWC's Investigation and Agreed Order of Remediation

In June 1991, the TWC issued its preliminary report. The report detailed the history of ownership of and operations on the property, described the contamination present as "hazardous," and attributed the contamination to the period of Delta's operations.

In November 1991, West and Delta entered into an Agreed Order for Remediation with the TWC. The Agreed Order named West, his company (Royle Container), and Delta as respondents and deemed them "responsible" and "liable" parties within the Solid Waste Disposal Act. See TEX. HEALTH & SAFETY CODE ANN. § 361.271 (Vernon 2001). The Order found that Delta buried the drums and discharged rinsewater and spent solvents into earthen pits. The Order then outlined several steps to be taken by the respondents from planning to reporting to implementation.

## E. What Has and Has Not Been Done

Delta/Brenntag hired ARCADIS, an independent environmental consulting firm, which drilled monitoring wells, took soil samples, and tested the soil. ARCADIS has not completed the remediation of the property. According to Brenntag's expert, Michael Gates, Brenntag has spent $200,000.00 to $300,000.00 for ARCADIS' services in advancement of the Agreed Order. In June 2003, Brenntag submitted its remediation action plan, which has not yet been approved. Gates testified that the cost to pump and treat the site with a sugar water treatment in accordance with the remediation plan would cost approximately $750,000.00 to $1,000,000.00.

## F. West Files Suit

Over a decade after the parties entered into the Agreed Order, West filed suit.[3] After the evidence was closed and the parties rested, the trial court allowed West to amend his petition to include a claim for breach of contract. The parties stipulated that the prevailing party's attorney's fees would be $59,000.00.

## G. Jury Charge and Verdict

The trial court submitted the case to the jury on theories of negligence, nuisance, and breach of contract.[4] Specifically, the jury was asked whether Brenntag failed to comply with the Agreed Order and what damages such failure caused to West. Delta did not object to the submission of the

---

2. The TWC is the predecessor to the Texas Natural Resource Conservation Commission and, now, the Texas Commission on Environmental Quality.

3. Brenntag filed a counterclaim for contribution, seeking West's portion of the approximately $270,000.00 Brenntag has spent toward meeting the Agreed Order and his portion of future costs estimated at $800,000.00.

4. Because the evidence conclusively established that Delta never owned the land at issue and that West had purchased from an intervening landowner at any rate, the trial court granted Brenntag's motion for directed verdict on West's claim for recision of the sale of the property.

case in this manner. The jury found that Brenntag did fail to comply with the Agreed Order and that its failure caused West $900,000.00 in damages. The jury found in favor of West on all other issues as well. The jury then returned a verdict favoring West on the issue of exemplary damages.

## I. Trial Court's Judgment

The court entered judgment in favor of West, awarding actual damages in the amount of $1,024,986.30, plus post-judgment interest, and $500,000.00 in exemplary damages. The judgment recites all the jury's findings, but does not specify on which it was based. The trial court did not award attorney's fees to West.

## J. Appellate History

Despite the sizeable award, West filed his notice of appeal July 12, 2004, indicating that his appeal would be taken to this Court. Brenntag filed its notice of appeal August 11, 2004, in the Tyler Court of Appeals.[5] Brenntag moved to dismiss the appeal filed in this Court and transfer the case to the Tyler court. Brenntag argued that West simply wanted to take the position of appellant and interfere with Brenntag's appeal and that West's appeal was frivolous and should be dismissed.[6]

The matter was forwarded to the Texas Supreme Court. The Texas Supreme Court denied Brenntag's motion to dismiss and its motion to transfer. Therefore, this Court has jurisdiction to determine the appeal and cross-appeal of the trial court's judgment.

## K. West's Appeal and Brenntag's Cross–Appeal

West appeals the trial court's refusal to award attorney's fees. West contends the trial court was required to do so since the parties stipulated that the prevailing party's attorney's fees would be $59,000.00. Brenntag also appeals the trial court's judgment, bringing five points of error. For the purpose of clarity and in a manner consistent with the parties' positions at argument, we first address Brenntag's cross-points of error.

## II. STANDING

Brenntag points out that West bought the Valentine Avenue property in 1984, years after Delta had deposited the contaminants. Since this injury occurred before West's ownership, and since West did not get an assignment of claims from the previous landowner, Brenntag argues West lacks standing to sue Brenntag for those injuries occurring in 1976–1980, while Delta operated its business on the property. Concluding the pleadings and evidence fail to show a new injury during West's ownership, we agree and dismiss West's negligence and nuisance claims for want of jurisdiction.

## A. Standing of Landowner to Sue for Injury to Land

█ In order for a landowner to have standing to sue for injury to land, one of

---

**5.** Gregg County, from which this appeal was taken, lies within both the Sixth and the Twelfth appellate districts. *See* TEX. GOV'T CODE ANN. § 22.201(g), (m) (Vernon 2004).

**6.** West actually filed one prior notice of appeal and a prior supplemental notice of appeal. In its first notice of appeal, West complained of the trial court's imposition of a five percent post-judgment interest rate rather than ten percent and the omission of certain items of evidence. In its supplemental notice of appeal, West claimed the trial court erred in excluding "certain items of evidence." In its motion to dismiss, Brenntag argued that the interest rate was set by statute and clearly applied to this case and that there were no items of West's offered evidence excluded by the trial court.

two circumstances must exist. One, in the case where the injury occurred to the land before the current landowner's purchase of the land, the vendor must have assigned such claims to the landowner. Two, the injury to the land must have occurred during the plaintiff-landowner's ownership of the property.

■ No one contends that Sikes, the intervening landowner, assigned such claims to West.[7] *See Vann v. Bowie Sewerage Co.*, 127 Tex. 97, 90 S.W.2d 561, 563 (1936). That being the case, the issue, not a new one to this Court, is whether there was an injury to the land while West owned the property.

Recently, we have held that "a landowner lacks standing to sue for injury to real property when any injury occurred before the landowner acquired the property, his or her deed contains no assignment of any cause of action, and there is no evidence of a new injury since the current landowner has owned the property." *See Cook*, 145 S.W.3d at 780. In *Cook*, when Exxon ceased its operations on the land and abandoned its equipment, the damage was complete. *Id.* at 785. Affirming the trial court's summary judgment, we concluded Cook failed to present any evidence that he sustained a new injury since he acquired the property. *Id.* at 786. Thus, he lacked standing to sue for injury to the land.[8] *Id.*

We also addressed the issue of standing in a similar situation in *Denman v. Citgo Pipeline Co.*, 123 S.W.3d 728 (Tex.App.-Texarkana 2003, no pet.). The Denmans discovered soil contamination, buried concrete structures, and asbestos-covered pipelines soon after they purchased the property. *Denman*, 123 S.W.3d at 731. They sued Citgo, which had conducted operations on the land for twenty-two years before ceasing operations a year and a half before the Denmans purchased the land. *Id.* at 730. The Denmans were subsequent purchasers and had no assignment of the claim from the previous landowner. *Id.* at 731–34. We affirmed summary judgment in favor of Citgo because the Denmans lacked standing to sue, having shown no injury to land during their ownership. *Id.*

In *Exxon Corp. v. Pluff*, 94 S.W.3d 22 (Tex.App.-Tyler 2002, pet. denied), a landowner sued Exxon based on the oil company's failure to remove all of the oilfield materials used in drilling and operation of oil wells on his property. Pluff testified that his claim against Exxon was based on its failure to remove all of the oilfield materials that were used in the drilling and operation of the oil wells on the property and that all of those materials were on the property before he bought it. *Id.* at 26. He also testified that Exxon had not conducted any operations on the prop-

---

7. The right to sue for the injury is a personal right belonging to the person owning the property at the time of the injury. *Cook v. Exxon Corp.*, 145 S.W.3d 776, 781 (Tex.App.-Texarkana 2004, no pet.); *Lay v. Aetna Ins. Co.*, 599 S.W.2d 684, 686 (Tex.Civ.App.-Austin 1980, writ ref'd n.r.e.). Therefore, without express provision, the right does not pass to a subsequent purchaser of the property. *Abbott*, 721 S.W.2d at 875.

8. In *Cook*, this Court stated that, whether the injury was temporary or permanent, the injury had to have occurred while the plaintiff owned the land: "Even if the distinction between temporary and permanent is relevant to the issue of standing, a current owner would have standing only if a new injury occurred while he or she owned the property." *See Cook*, 145 S.W.3d at 784. West's and Brenntag's arguments have mingled the temporary/permanent distinction into the inquiry regarding whether *any* injury occurred during West's ownership. The essence of West's position is that the injury to the land— the contamination—was a temporary injury *that occurred while he owned the property.*

erty since he purchased it and that no oil spills occurred after the date he purchased the property. *Id.* The Tyler Court of Appeals concluded Pluff had no cause of action, and therefore lacked standing, because he showed no injury occurred during his ownership of the land. *Id.* at 28. The court concluded the undisputed evidence "showed a continuing condition that already existed on the date of purchase," and "[w]ithout a new injury that occurred after [Pluff] purchased the property or an assignment of a cause of action for the prior injury, [Pluff] had not been aggrieved and therefore had no standing." *Id.*

## B. Review of Standing

 Standing is a necessary component of subject-matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 445–46 (Tex.1993). Whether a trial court has subject-matter jurisdiction is a question of law subject to de novo review. *Pluff,* 94 S.W.3d at 26.

 The proper initial inquiry is whether West had a "cause of action, which involves the combination of a right on the part of the plaintiff and a violation of such right by defendant." *See id.* The general test for standing in Texas requires that there be a real controversy between the parties that will be actually determined by the judicial declaration sought. *Tex. Ass'n of Bus.,* 852 S.W.2d at 446. It is important to keep in mind that standing deals with whether a litigant is the proper person to bring a lawsuit, not whether that party can ultimately prevail on the claims asserted. *See Hunt v. Bass,* 664 S.W.2d 323, 324 (Tex.1984) (holding "the question of standing is distinct from the question of proof and once the plaintiffs alleged an interest peculiar to themselves and distinguishable from the public generally, they were entitled to a factual hearing");

*Faulkner v. Bost,* 137 S.W.3d 254, 259 (Tex.App.-Tyler 2004, no pet.).

 Standing is generally a question of law determined by the court from the pleadings. *See Tex. Nat. Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 855 (Tex.2002); *Tex. Ass'n of Business,* 852 S.W.2d at 446. To have standing, the pleader must allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Tex. Ass'n of Bus.,* 852 S.W.2d at 446; *Bailey v. City of Austin,* 972 S.W.2d 180, 184–85 (Tex.App.-Austin 1998, pet. denied). The Texas Supreme Court has stated, however, that plaintiffs need not preview their case on the merits simply to establish jurisdiction. *See Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554–55 (Tex.2000).

 A review of standing is not limited to the pleadings when a plaintiff is required to prove facts that are "primarily jurisdictional," as when a plaintiff organization attempts to establish associational standing. *Id.* An appellate court should construe the petition in favor of the party, and if necessary, review the entire record to determine if any evidence supports standing. *Tex. Ass'n of Bus.,* 852 S.W.2d at 446; *Bailey,* 972 S.W.2d at 184–85. Here, as described, in order to establish his standing as a subsequent landowner, West was required to show a new, distinct injury that occurred after he acquired the property. So, the issue of West's standing as a subsequent landowner is analogous to the determination of associational standing insofar as the determination of standing does require the plaintiff to prove facts that are "primarily jurisdictional." With that, we conclude this case is one in which it is necessary to review the entire record to determine if any evidence supports standing. *See Tex. Ass'n of Bus.,* 852 S.W.2d at 446.

## C. No *New* Injury, No Standing

■ First, we look to West's pleadings, construing them in a light most favorable to him. *See id.* at 445. In his first amended petition, West alleges the following:

This suit [arose] when the plaintiff WEST bought a tract of land that had previously belonged to Brenntag's predecessor in interest, DELTA SOLVENTS AND CHEMICAL COMPANY or one of its affiliates. DELTA had conducted operations on the premises prior to West's acquisition of the property.

So, the petition makes clear that the injury to the land involved Delta's prior operations. Since the petition clearly puts West in the position of a subsequent landowner, these allegations, the inaccuracies in ownership aside, raise the need for West to further allege that Delta's prior operations somehow had injured the land during West's ownership. However, the petition does not do so. Rather, the petition only confirms that need by alleging that, unknown to West at the time of his purchase of the land, "DELTA had violated numerous environmental laws during their time on the property." West does not allege any dates of a new injury or a more general allegation that the land was injured during his ownership. That is, he does not allege any of the "primarily jurisdictional" facts necessary to establish standing. *See Blue*, 34 S.W.3d at 554–55. He alleges that he would not have bought the property had he known of the contamination and that, as a result of the contamination, West

cannot sell the property without taking a "big loss on it." While these allegations do have some bearing on the issue of damages, they do not provide the specific facts necessary to confer standing on West when the petition plainly states that West is a subsequent owner of the land on which Delta operated.

We recognize that, since the issue of standing was not raised until Brenntag's motion for judgment notwithstanding the verdict, West did not have an opportunity to cure the inadequacies in his pleadings. We bear that in mind as we move on to a review of the record to determine whether it reveals facts sufficient to confer standing.

West argues that the gradual leaking of contamination into the soil continued to occur while he owned the property and that, therefore, he has sustained a new injury and has standing to sue. He argues that he has sustained a new injury since "the hazardous waste had not been fully removed, the ground water had been contaminated, the water had migrated offsite, and the site had not been fully secured."

The record establishes that the injury to the Valentine Avenue property occurred during the years 1976–1980, while Delta irresponsibly dumped solvents into the earth and buried several drums of solvents into the earth. The fact, on which West relies, that the injury has remained throughout West's ownership does not create a new injury to the land. Rather, the injury is a continuous, lingering injury[9]

---

**9.** Although not necessary to the disposition of this appeal, we address the parties' well-developed contentions regarding the nature of the injury to the Valentine Avenue property and note the applicability of the Texas Supreme Court's recent decision in *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 272 (Tex.2004), in which the Court clarified the temporary/permanent distinction when evaluating injuries to land.

A nuisance is permanent if it is "constant and continuous," and if "injury constantly and regularly recurs." *Id.* In contrast, a nuisance is temporary if it is of limited duration. Thus, a nuisance may be considered temporary if it is uncertain if any future injury will occur, or if future injury "is liable to occur only at long intervals." *Id.* A nuisance is also temporary if it is "occasional, intermittent or

and one for which West, a subsequent landowner without an assignment of claims, has no standing to sue. The trial court was without subject-matter jurisdiction over these claims. We sustain Brenntag's complaint, and dismiss for want of jurisdiction West's claims for injury to land. *See Douglas v. Delp,* 987 S.W.2d 879, 882 (Tex.1999).

## III. BREACH OF CONTRACT

Our disposition of West's claims of negligence and nuisance concerning the injuries to land does not dispose of the issues concerning the jury's findings on West's contract claim. After the close of evidence, the trial court allowed West to amend his petition to allege a cause of action for breach of contract. Brenntag did not object to this amendment and, in fact, submitted its own question on West's performance under the Agreed Order. The contract claim is, thus, properly before us. We will address the merits of Brenntag's cross-point of error regarding the trial court's denial of Brenntag's motion for judgment notwithstanding the jury's verdict on the breach of contract issues.

The jury found that Brenntag, but not West, "fail[ed] to comply with the November 1991 Agreed Order" and that Brenntag's failure resulted in damages to West in the amount of $900,000.00.[10] Brenntag contends the trial court should have disregarded the jury's answers on West's breach of contract claim because the evidence established, as a matter of law, that there was no cause of action for a breach of contract.

### A. Standard of Review

 A trial court may disregard a jury's findings and grant a motion for judgment notwithstanding the verdict when there is no evidence on which the jury could have made its findings. *See Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970). No evidence exists, and the trial court should render a

---

recurrent," or "sporadic and contingent upon some irregular force such as rain." *Id.* "Thus, if a nuisance occurs several times in the years leading up to a trial and is likely to continue, jurors will generally have enough evidence of frequency and duration to reasonably evaluate its impact on neighboring property values. In such cases, the nuisance should be treated as permanent, even if the exact dates, frequency, or extent of future damage remain unknown." *Id.* at 280 (footnote omitted). "Conversely, a nuisance as to which any future impact remains speculative at the time of trial must be deemed 'temporary.'" *Id.*

Here, contrary to the trial court's determination, the injury to the land was, as a matter of law, permanent under *Schneider Nat'l Carriers.* That being the case, even if West would have alleged that he sustained a new injury by the release in 1988 of the chemical from the drum ruptured while bulldozing, such a claim would clearly be barred by the two-year statute of limitations. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (Vernon 2002). He learned soon after the release that Delta likely deposited the drums in the ground. At the very latest, West knew of the source of the contamination by 1991, when the TWC released its report identifying Delta as the source of contamination. He did not bring suit until 2002.

Had West been successful in arguing that the injury was a temporary one, he still would have encountered significant obstacles, since his recovery would be limited to those damages sustained during the two years before suit. *See Yancy v. City of Tyler,* 836 S.W.2d 337, 341 (Tex.App.-Tyler 1992, writ denied). The evidence would not support the jury's finding that West sustained $900,000.00 in damages between 2000 and 2002.

**10.** The jury also was asked whether West failed to comply with the Agreed Order, a question to which it answered no. Brenntag contends that such answers—that Brenntag failed to comply and that West did not—are irreconcilable.

judgment notwithstanding the verdict, when the record discloses one of the following: (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *See Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). In making this determination, we must review the record in the light most favorable to the verdict, considering only the evidence and inferences that support the verdict and rejecting the evidence and inferences contrary to the verdict. *Mancorp,* 802 S.W.2d at 227.

## B. Breach of Contract

 The elements of a breach of contract are that (1) the plaintiff and defendant had a valid, enforceable contract; (2) the plaintiff performed or tendered performance of the contractual obligations; (3) the defendant breached the contract; and (4) the defendant's breach caused the plaintiff's injuries. *Wright v. Christian & Smith,* 950 S.W.2d 411, 412 (Tex.App.-Houston [1st Dist.] 1997, no pet.). Applying the no-evidence standards to the elements of breach of contract, we conclude that the trial court should have disregarded the jury's finding that Brenntag's failure to comply with the Agreed Order damaged West in the amount of $900,000.00.

 The parties agree that the Agreed Order did impose contractual obligations to the State; the remaining issue appears to center on the existence of obli-

gations to one another. More specifically, we must determine whether the Agreed Order creates a valid, enforceable contract between West and Brenntag as co-respondents.[11] In order to have a valid, enforceable contract satisfying the first element of a cause of action for breach, there must be *mutual obligations between West and Brenntag:*

> A contract must be based on valid consideration, i.e., mutuality of obligation. Consideration consists of benefits and detriments to the contracting parties. The detriments must induce the parties to make the promises, and the promises must induce the parties to incur the detriments. A contract that lacks consideration lacks mutuality of obligation and is unenforceable.

*In re Turner Bros. Trucking Co.,* 8 S.W.3d 370, 373 (Tex.App.-Texarkana 1999, orig. proceeding) (citing *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 408–09 (Tex.1997)). Put another way, a valid contract must contain "an exchange of obligations of value to each contracting party, reciprocally or mutually induced." *See Holguin v. Twin Cities Servs., Inc.,* 750 S.W.2d 817, 819 (Tex.App.-El Paso 1988, no writ).

## C. No Contract Between West and Brenntag

Although there are arguable points regarding each element of a breach of contract, we need only address the first element. Even reading the Agreed Order in a light most favorable to the verdict, we do not find support for the position that it created a valid, enforceable contract *between West and Brenntag.* In fact, it establishes the opposite. Again, the Order

---

11. If we can give a definite legal meaning or interpretation to a written instrument, it is not ambiguous. *Gen. Devices, Inc. v. Bacon,* 888 S.W.2d 497, 502 (Tex.App.-Dallas 1994, writ denied). We must enforce unambiguous contracts as written. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 517, 243 S.W.2d 154, 157 (1951); *Gen. Devices,* 888 S.W.2d at 502.

names as "responsible" and "liable" respondents West, Royle Container, and Delta. It goes on to outline the duties which the respondents, as a group, must fulfill. These duties are imposed by and owed to *the State*. Nowhere does the Order specify what Brenntag must do to fulfill obligations to West.[12] The Agreed Order does not reveal mutual obligations between West and Brenntag. Rather, the consideration supporting the Agreed Order flows only between the State and the respondents. Nor does the remaining record support the jury's findings as to the contractual damages. Testimony regarding a lack of communication and cooperation between West and Brenntag over the course of several years serves to confirm that the Agreed Order did not create a valid, enforceable contract between West and Brenntag.

The record, even when viewed in a light most favorable to the jury's findings, does not support the finding that Brenntag's failure to comply with the Agreed Order caused $900,000.00 in damages to West. The record establishes, as a matter of law, that West could not recover on a breach of contract claim. The trial court should have granted Brenntag's motion for judgment notwithstanding the verdict as to the jury's findings regarding the damages sustained due to Brenntag's alleged breach of the Agreed Order. We sustain Brenntag's third point of error.

## IV. ATTORNEY'S FEES: WEST'S SOLE POINT OF ERROR

West argues that the trial court erred by not awarding him attorney's fees in light of the jury's finding on his breach of contract claim and the parties' stipulation as to the amount of reasonable attorney's fees for the prevailing party. He prays that this Court modify the trial court's judgment to award him $59,000.00 in attorney's fees. *See* Tex.R.App. P. 43.2. Brenntag argues that West never brought this issue to the trial court's attention and that, in fact, the judgment entered closely resembles the judgment proposed by West himself, including the omission of attorney's fees. Additionally, Brenntag points to West's motion for entry of judgment that did not award attorney's fees. We agree with Brenntag's position and find no error in the omission of attorney's fees.

### A. Awarding Attorney's Fees Under Section 38.001

The award of reasonable attorney's fees to a plaintiff recovering on a valid claim of breach of contract is mandatory under Texas law. *In re Smith*, 966 F.2d 973, 978 (5th Cir.1992). Once a jury finds that a party should prevail on a claim on which attorney's fees are mandated, the only question remaining is the reasonable value of the attorney's fees, not whether they should be awarded. *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 23 (Tex.App.-Tyler 2000, pet. denied).

West sought recovery of his attorney's fees pursuant to the Texas Civil Practice and Remedies Code which provides, in pertinent part, that "[a] person may recover reasonable attorney's fees ... in addition to the amount of a valid claim and cost, if the claim is for: ... an oral or written contract." Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (Vernon 1997).

### B. No Error Since No Recovery on Breach of Contract Claim

West seeks attorney's fees solely on the basis of the jury's findings regarding

12. In fact, only Royle Container is specifically directed to perform certain duties. As a current operator, the State ordered Royle Container to adhere to registration and permit requirements. All other duties in the Agreed Order are owed by the respondents as a group.

breach of contract. We have concluded the trial court should have disregarded the jury's finding as to breach of the Agreed Order, since there was no evidence to support such a claim. So, it obviously follows that West was not entitled to attorney's fees based on the jury's findings regarding breach of contract.

## V. CONCLUSION

We sustain Brenntag's first cross-point of error regarding standing, concluding West lacked standing to sue for negligence or nuisance, since he failed to show a new injury to his land during his ownership. We also sustain Brenntag's point challenging the jury's finding as to breach of the Agreed Order. The Order does not create a valid, enforceable contract between co-respondents West and Brenntag. Our disposition of Brenntag's first and third contentions makes it unnecessary to address its remaining issues on appeal.

We overrule West's complaint regarding the trial court's failure to award attorney's fees, since we have concluded there was no evidence to support the only cause of action on which he sought attorney's fees. Having found that West lacked standing to sue for negligence or nuisance, the judgment as to those claims is reversed and judgment is rendered that those claims be dismissed for want of jurisdiction. The judgment as to the remaining claims is reversed and judgment is rendered that West take nothing.